**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and REESE, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 27, 2018**

# In the Court of Appeals of Georgia

A18A0116. AWTREY v. THE STATE.

A18A0117. AWTREY v. THE STATE.

MCMILLIAN, Judge.

Siblings Barbara Awtrey and Ricky Awtrey (collectively "appellants")[1] were jointly tried and convicted of multiple counts of violating the Georgia Controlled Substances Act by selling products containing indazole amide, a Schedule I controlled substance.[2] They have filed separate but essentially identical appeals to this Court, contending that the evidence was insufficient and that their trial counsel was ineffective. As more fully set forth below, we now affirm.

---

[1] For ease of reference, we refer to appellants individually by their first names.

[2] Barbara was also convicted of possession of methamphetamine and drug related objects or equipment, and Ricky was convicted of possession of less than one ounce of marijuana.

1. Appellants first challenge the sufficiency of the evidence to support their convictions for selling products containing indazole amide,[3] as set out in Counts 1, 2, and 6 of the indictment.[4]

Construed to support the jury's verdict,[5] the evidence shows that sometime in 2010, Douglas County law enforcement became increasingly concerned about the growing sale of what is commonly referred to as synthetic marijuana and began

---

[3] Indazole amide was added to the list of Schedule I controlled substances in March 2012. See OCGA § 16-13-25 (12) (J); Ga. L. 2012, p. 40, § 3. The State's expert forensic chemist testified that indazole amide and like substances are synthetic compounds that work on the same central nervous system receptors as natural cannabinoids like THC found in marijuana plants, but these synthetic substances are often incredibly more potent than THC.

[4] Count 1 charged appellants, individually and as parties to the crime, with selling a product known as Roses containing the Schedule I controlled substance indazole amide on August 8, 2013. Count 2 charged appellants with selling the Schedule I controlled substance indazole amide on August 23, 2013 by selling products known as B2 Da Bomb and Roses. Count 3 charged Ricky with possession of less than one ounce of marijuana. Count 4 charged Barbara with possession of methamphetamine. Count 5 charged Barbara with possession with intent to use a methamphetamine pipe. Count 6 charged appellants with selling the Schedule I controlled substance indazole amide between July 29, 2013 and August 26, 2013, by selling products known as B2 Da Bomb, Roses, and Street Legal containing the product. In their enumeration challenging the sufficiency of the evidence, appellants incorrectly refer to Count 3, which involved the simple possession charge against Ricky, when their arguments under that enumeration clearly pertain to Counts 1, 2 and 6.

[5] *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2

making controlled buys from retail operations where they suspected such products were being sold. Some of these substances had not yet been classified as illegal under Georgia law, and some dealers attempted to stay one step ahead of the law by constantly altering the molecular structure of the chemicals so the substances they were selling as synthetic marijuana would no longer come within the chemical definition of a controlled substance under Georgia's scheduled classifications of controlled substances. These substances were usually marketed as a type of potpourri, incense, or something of a similar nature.

In late December 2012, Douglas County law enforcement began receiving complaints that led them to believe that synthetic marijuana was being sold at Elite Adult,[6] an adult novelty store owned and operated by appellant Ricky Awtrey. His sister, appellant Barbara Awtrey, sometimes worked at the store, trained employees, and performed various managerial tasks. In addition to adult novelty products, Elite Adult's product line included tobacco and related products, rolling papers, bongs, e-cigarettes, air fresheners and potpourri, and similar products. Some of the air fresheners and potpourri were marked with warnings against human consumption,

---

[6] Testimony was presented that there had been an increase in foot traffic going in and out of the store and nearby businesses had observed teenagers sitting in the cars and smoking suspected synthetic marijuana and passing out.

and law enforcement suspected it was these type products that were being sold and used as synthetic marijuana.

Sometime in early December 2012, a confidential informant made a controlled buy from Elite Adult of a package labeled Blueberry Kronic. Subsequent testing revealed that the Kronic contained a chemical which had been placed on the Pharmacy Board's list of banned substances, but this chemical was not classified as a controlled substance under the Georgia Controlled Substances Act. Law enforcement returned to Elite Adult in late March 2013 to make another controlled buy. On that occasion, a confidential informant purchased a product called Premium Potpourri, but that product also did not test positive for a controlled substance.

In August 2013, Randy Folsom, a Sergeant over the narcotics division of the Douglas County Sheriff's Office,[7] and other officers were once again making controlled buys from businesses they suspected of selling synthetic marijuana. On August 8, 2013, Folsom and the other officers entered Elite Adult, where they observed that only one package each of the products they suspected of containing synthetic marijuana was visibly displayed, which they found unusual and consistent

_____

[7] Sergeant Folsom was tendered as an expert in the field of narcotics investigation.

4

with the sale of synthetic marijuana.[8] Folsom made contact with an employee and purchased a package of Roses, a potpourri type product that he knew had previously tested positive for illegal substances, and a Green Giant "campfire enhancer," which Folsom knew from prior information was a product that Ricky home made.[9] The package of Roses contained the following warnings: "This product is intended to be used with sage oil incense, place holes in the pack at hand." Additionally, the packaging stated "for novelty purposes only" and "Not for human consumption. Please call poison control if consumed. Do not smoke or ingest this product directly." and "DEA and state compliant." Sergeant Folsom testified he found this last notation unusual since he had not previously seen it on a package of potpourri. Sergeant Folsom paid $17 for the one gram package of Roses.[10]

---

[8] Folsom testified that he suspected this change was to prevent officers from seizing large quantities of these products since under the Emergency Rule promulgated by the Georgia Narcotics Administration and Georgia Board of Pharmacy, law enforcement could only seize suspected banned or illegal substances that were in plain view.

[9] No controlled substances were found in the Green Giant.

[10] One gram is equivalent to 0.04 ounces. Metric Conversions, Grams to Ounces, http://www.metric-conversions.org/weight/grams-to-ounces-table.htm (last visited June 26, 2018).

Investigator Bryland Myers with the Douglas County Sheriff's Office special investigations division went back to Elite Adult on August 23, 2013. He purchased another package of Roses and another product suspected of containing a banned or controlled substance called B2 Da Bomb. Myers paid $44.92 for the two packages,[11] and testified that when he asked for Roses, the store clerk asked if he meant air freshener.

Subsequent chemical testing of these products as well as the Roses purchased on August 8, 2013, revealed that they contained the controlled substance indazole amide. In addition to testimony about the nature of the substance, evidence was also presented that these type chemicals are often purchased from China because of lack of regulation and typically are shipped directly to the purchaser. Further, unlike some other controlled substances, the entire class of indazole amides are included in the Schedule I controlled drug classification, and minor molecular structure changes do not make it legal.

Police subsequently obtained a warrant to search Ricky's home at 9703 Squirrel Wood Run in Douglas County, Georgia, and both the home and Elite Adult were searched by police. Both Ricky and Barbara were at the residence at the time of

---

[11] Each package weighed approximately three grams.

the search. During the search of Ricky's home, officers found merchandise from the store, including numerous boxes of Roses and Street Legal and other similar type products sold at Elite Adult, as well as tobacco products and adult novelty items,[12] a sealing machine, labels, empty packaging, bags of leaves of the type commonly used to produce synthetic marijuana, a pump-like sprayer, and gallon jugs of different flavorings. Officers also located a small amount of marijuana in Ricky's bedroom and a bag with methamphetamine residue and a meth pipe in Barbara's purse. During the search of Elite Adult, officers found packages of Roses, B2 Da Bomb, V8,[13] and Street Legal stored in red bowls in drawers under the display counter, and all of the samples from those bags that were tested were positive for indazole amide. Police also found receipts for Western Union money grams where Ricky had appeared to make purchases from China, and one of the investigating officers testified she did an internet search and found that during 2012 and the early part of 2013, Ricky was attempting to buy a banned substance from China.

---

[12]The evidence showed that Elite Adult did not have a store room for excess merchandise and Ricky typically stored inventory at his home.

[13] One of the packages of V8 also bore the notation "4:20 MTH" which, according to testimony at trial, refers to international marijuana smoking time.

Ricky told police that all the products that were subsequently identified as containing illegal substances had been purchased from B & B Distributions ("B & B") and that he had letters of affirmation from B & B stating that the products did not contain any illegal substances as provided under Indiana, Ohio, and federal drug laws, and he also had independent laboratory tests showing that no "cannabimimetic agents"or synthetic cannabinoids had been detected in the products at issue. These documents were introduced into evidence at trial. Although some of the lab reports contain references to several substances listed in Schedule I of the Georgia Controlled Substances Act, no reference was made to indazole amide on any of the tests. See OCGA § 16-13-25 (12).

Employees of Elite Adult, including the clerks who made the August 8 and August 13, 2013 sales, also testified at trial. They said that during their training to work at the store they were instructed never to comment about smoking the product and that they would be fired if they did so. Further, one clerk said that she had been instructed that Roses, V8, Street Legal, and B2 DaBomb were legal air fresheners and legal potpourri and Ricky said he had the lab reports to prove it. However, the former clerks also testified that customers sometimes purchased rolling papers or pipes with the products, and one of the clerks became suspicious that the products were not

8

really legal after customers buying the product started acting "different" and "changing personality-wise" and would come into the store three or four times a day to purchase the products. Another clerk opined that people were crazy to pay the price they did for the products at issue. The State also admitted a recording of Ricky's jail phone conversation with his mother in which he stated that he was selling "legal weed" or "herbal highs."

(a) Appellants first argue that the State failed to prove that the products they were charged with selling on August 8, 2013 and August 23, 2013 (Counts 1 & 2), tested positive for indazole amide. We have reviewed the State's evidence concerning this issue, including the testimony and reports produced by the forensic chemist who tested the confiscated products as well as the exhibits introduced by the State showing which products she received and the results of the testing, and find this contention to be without merit.

(b) Appellants next argue that the evidence presented at trial was insufficient to show that they knew the products they were selling contained an illegal substance.

Under OCGA § 16-13-30 (b), it is unlawful in this state "for any person to manufacture, deliver, distribute, dispense, administer, sell, or possess with intent to distribute any controlled substance." As charged in the pertinent counts of the

indictment, appellants were charged with violating that section by selling products known as Roses, B2 Da Bomb, and Street Legal containing the controlled substance indazole amide. Although OCGA § 16-13-30 (b) does not include an express mens rea requirement, our Supreme Court has made clear that the crimes listed in OCGA § 16-13-30 are not strict liability crimes, and the criminal intent required by that section is the intent to possess, sell, or distribute "a drug with knowledge of the chemical identity of that drug." *Duvall v. State*, 289 Ga. 540, 542 (712 SE2d 850) (2011).[14] See also *Calloway v. State*, 303 Ga. 48, 54 (2) (i), n.6 (810 SE2d 105) (2018) (OCGA § 16-13-30 requires same mens rea as similar federal statute, even though requirement is not express). Compare *Mohamed v. State*, 314 Ga. App. 181, 183-84 (1) (723 SE2d 694) (2012) (evidence was sufficient to establish that the defendant possessed khat, but was insufficient he "intended to possess khat with

---

[14] We note that *Duvall* did not concern a challenge to the sufficiency of the evidence, but rather whether the defendant in that case was entitled to a jury charge on the defense of mistake of fact where the defendant asserted that he believed that the controlled substance he was charged with possessing was actually an over the counter sleep medication. Here, appellants have not challenged the jury charge, and in any event our review shows that the jury was properly charged on the necessity of finding the requisite mens rea. See also *Patterson v. State*, 328 Ga. App. 111, 119-20 (4) (761 SE2d 524) (2014) (charge plain error where jury would be entitled to find defendant guilty without making a finding regarding his knowledge that the pill he was charged with possessing contained hydrocodone).

10

knowledge that it contained cathinone, which was the controlled substance specified in the accusation.") (emphasis omitted).

An accused's knowledge of the chemical identity of an illegal substance is purely a question of fact. *Duvall v. State*, 289 Ga. at 542; *Patterson*, 328 Ga. App. at 117 (4). And like any other fact,

> knowledge . . . may be proved . . . by circumstantial evidence. And it has long been the law that knowledge may be proved by facts and circumstances from which a jury could reasonably infer that a defendant knowingly possessed contraband. Thus, OCGA § 16-2-6 provides that a jury may find criminal intention upon consideration of the words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted.

(Citation omitted.) *Cooper v. State*, 315 Ga. App. 773, 774-75 (1) (728 SE2d 289) (2012).

Here, the evidence, albeit circumstantial, was sufficient to support that the Awtreys knew that they were selling products containing a controlled substance, and not air fresheners and potpourri. The products were pre-packaged in small quantities, yet sold for unusually large amounts per package. The packages also warned that the product was not for human consumption even though they purported to be air fresheners and potpourri. And even though the Elite Adult clerks were trained not to

11

refer to or market these products as "legal weed," they observed customers coming in multiple times a day to purchase them, along with smoking papers, and these customers often returned in an altered state. Ricky Awtrey himself referred to these products as "legal weed" or "herbal highs," thus showing that he knew that customers were purchasing these products to smoke and the effect of the products.

The evidence also supported that the Awtreys were knowledgeable and experienced retailers in the synthetic drug market. Ricky had made a number of purchases of banned substances from China, and materials and equipment were found in his home consistent with the manufacture of synthetic drug products, although no banned or illegal substances were found in his home other than pre-packaged items that he had purchased from B&B. Ricky had also obtained reports from allegedly independent labs confirming the legality of the potpourri and air fresheners that he and his sister sold, and evidence was presented that the lab reports were unnecessary if the products were really what they purported to be. Barbara was the bookkeeper for Elite Adult, was listed as the point of contact on invoices found at Elite Adult, trained the clerks on how to sell the products, and sold the products herself.

Based on this and other evidence, the jury was authorized to find that the Awtreys knew that they were selling a controlled substance, even though they

12

claimed that they were unaware of the precise chemical compound in the products, and reversal is not required on this basis. *Cooper*, 315 Ga. App. at 774-75 (1) (rejecting defendant's argument that the evidence was insufficient where he admitted to possessing an illegal controlled substance albeit it a different controlled substance than the one he was charged with possessing); *Serna v. State*, 308 Ga. App. 518, 520 (1) (707 SE2d 904) (2011) (evidence supported inference that defendant knew that the chemical compound in the drug to sedate his sexual battery victim was classified as a dangerous drug under the Dangerous Drug Act, OCGA § 16-13-70).

(c) Appellants also contend that the State failed to present sufficient evidence of venue. As the trial court found, no witness in this case affirmatively testified that Elite Adult was located in Douglas County. However, as our Supreme Court has made clear, venue may be established by direct or circumstantial evidence. When reviewing the sufficiency of the evidence of venue, we view the evidence in the light most favorable to the verdict to determine whether the evidence was sufficient to show beyond a reasonable doubt that the crime was committed in the county where the defendant was indicted and tried. *Propst v. State*, 299 Ga. 557, 561 (788 SE2d 484) (2016). The determination of whether venue has been established is an issue soundly

13

within the province of the jury. *Jones v. State*, 301 Ga. 1, 4 (1) (799 SE2d 196) (2017).

Although no witness ever testified directly that Elite Adult was located in Douglas County,[15] ample circumstantial evidence was presented from which a rational trier of fact could have found beyond a reasonable doubt that venue was proper in the county. Numerous law enforcement officers who testified for the State concerning their part in investigating the case, including the officers who made the purchases at Elite Adult, were affiliated with Douglas County, and in the absence of contrary evidence it is presumed that they performed their duties properly and acted within their jurisdiction. See *Propst*, 299 Ga. at 561 (1) (b); *Chapman v. State*, 275 Ga. 314, 317-18 (4) (565 SE2d 442) (2002). Further, the search was conducted by Douglas County law enforcement, and the documentation from the crime lab shows that it received the packages for testing from the search of Elite Adult from the Douglas County Sheriff's Office, the testing was requested by that office, and the results of the testing were directed to that office and other Douglas County officials. See *Probst*, 299 Ga. at 562 (1) (b) (evidence collected by sheriff's office supports venue in that

---

[15] We note that the direct testimony was presented that Ricky's home was located in Douglas County, and appellants do not challenge venue for the marijuana and methamphetamine charges.

county). This evidence, although circumstantial, was sufficient to establish venue beyond a reasonable doubt.

2. Appellants also allege multiple instances of ineffective assistance of trial counsel.

To prevail on their claim, appellants must show that their trial counsels' performance was professionally deficient and that, but for the deficiency, there is a reasonable probability that the trial would have ended with a more favorable result. *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984); *Burney v. State*, 299 Ga. 813, 824 (5) (792 SE2d 354) (2016). "Failure to satisfy either prong of the *Strickland* test is sufficient to defeat a claim of ineffective assistance, and it is not incumbent upon this Court to examine the other prong. . . ." (Citation and punctuation omitted.) *Smith v. State*, 296 Ga. 731, 733 (2) (770 SE2d 610) (2015). "[Appellants'] burden, though not impossible to carry, is a heavy one." *Butler v. State*, 292 Ga. 400, 405 (3) (738 SE2d 74) (2013).

(a) Appellants argue that their counsel should have objected to the admission of Sergeant Folsom as an expert in the area of investigating illegal narcotics generally and specifically contend that Folsom should not have been allowed to testify as an expert on synthetic drugs, the manufacture of synthetic drugs, the legislative history

15

of Georgia's drug laws pertaining to synthetics, and the legislative intent of Georgia's drug laws.

First, we reject appellants' contention that their trial attorneys rendered deficient performance by failing to object to the qualification of Sergeant Folsom as an expert in the area of drug investigations. The trial court found, and we agree, that the evidence supported that Sergeant Folsom, who was a sergeant over the narcotics division of the Douglas County Sheriff's Office, was an expert in this area based on his training and experience. Likewise, based on his training and experience, Sergeant Folson was qualified to testify about how synthetic drugs are manufactured and how they may be obtained from sources outside the United States. Because any objection on this basis would have been meritless, appellants cannot show deficient performance with respect to the failure to object to Folsom's qualifications as an expert. E.g., *Jones v. State*, 299 Ga. 377, 384 (5) (788 SE2d 477) (2016) (failure to make a meritless objection cannot constitute evidence of ineffective assistance).

Appellants also assert that trial counsel should have objected to Sergeant Folsom's testimony about the legislative and regulatory history of the banning of synthetic drugs. When questioned about these matters at the hearing on appellants' motion for new trial, trial counsel said he could recall Folsom's testimony only

16

vaguely and his failure to object would not have been part of his trial strategy. However, we are not required to accept that testimony on its face.

> [W]e are not limited in our assessment of the objective reasonableness of lawyer performance to the subjective reasons offered by trial counsel for his conduct. If a reasonable lawyer might have done what the actual lawyer did–whether for the same reasons given by the actual lawyer or different reasons entirely–the actual lawyer cannot be said to have performed in an objectively unreasonable way.

(Citation omitted.) *Gilmer v. State*, 339 Ga. App. 593, 596 (2) (a) (794 SE2d 653) (2016). "Trial tactics and strategy, no matter how mistaken in hindsight are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them." (Citation and punctuation omitted.) *Hardin v. State*, 344 Ga. App. 378, 383 (1) (b) (810 SE2d 602) (2018).

It is clear from our review of the record that trial counsels' strategy was to show that appellants took steps to not sell Schedule I narcotics, but that the laws and regulations were changing quickly and the appellants were caught unawares. To that end, trial counsel elicited testimony from a number of witnesses on the evolution of legislative and administrative bans of these synthetic products. Based on this record,

17

we cannot say that this strategy was so patently unreasonable that no competent attorney would have chosen it, and thus, it was not deficient for trial counsel to fail to object to Sergeant Folsom's cumulative testimony on this ground. See also *Butler v. State*, 292 Ga. at 408 (3) (c) (failure to object to evidence fully presented by other witnesses's testimony not ineffective). Appellants are not entitled to a new trial on this basis.

(b) Appellants next contend their trial counsel performed deficiently because they failed to object to Folsom's testimony concerning the effects of synthetic marijuana as experienced by first responders and emergency workers since he was not admitted as a medical expert and not qualified to give expert testimony in that area. However, this testimony did not qualify as medical expert testimony, but simply recounted what Sergeant Folsom knew based on his experience and documented reports of emergency calls involving older teens and young adults experiencing heart attack like symptoms, anxiety and hallucinations, and requiring transport to the emergency room after they had used synthetic marijuana. This assertion of ineffectiveness is also without merit.

(c) Appellants also argue that their trial counsel should have objected on relevance grounds when Investigator Cadwell testified to the legislative history of

Georgia's criminal drug statute and the Pharmacy Board's regulations, including testimony that, in part, it was the death of two teenagers that heightened concerns about synthetic marijuana and led to the enactment of these rules and laws. As found by the trial court, this testimony was relevant to understanding the context of the investigation, which had been complicated by the changing laws on synthetic drugs. Moreover, although Investigator Cadwell testified about the death of two teenagers as the precipitating event for certain legislation, it was clear from the entirety of her testimony, including the effective cross-examination conducted by defense counsel, that those deaths had no ties to Douglas County or the investigation of appellants or Elite Adult. Accordingly, we cannot say that trial counsels' strategy to blunt the effect of this testimony by cross examination, instead of objecting on relevance grounds, was so patently unreasonable that no competent trial counsel chosen it, and thus this enumeration provides no basis for reversal.

(d) Appellants next argue that trial counsel should have objected when Investigator Caldwell testified about an internet search that she conducted regarding Ricky's purchases from China and to the admission into evidence of the printout from the search. However, even assuming that an objection to the admission of this evidence might have been proper, which the State appears to concede, we do not

believe that appellants have demonstrated a reasonable probability they suffered prejudice on account of this failure. First, other evidence was also introduced showing that Ricky made numerous purchases from China. And although the State sought to use this evidence to show that Ricky was attempting to buy illegal substances from China, the testimony in fact revealed that the particular substance he was seeking to buy was banned but not illegal at the time he purchased it, which again bolstered appellants' defense that they may have known they were selling banned substances but not illegal substances. Accordingly, they are not entitled to a new trial on this basis.

(e) Appellants' final assertion of ineffectiveness concerns Defendant's Exhibit 75, which was a certified copy of a felony conviction of one of the State's witnesses that appellants had used to impeach the witness, but which also had Barbara's name on it, showing that Barbara had pleaded guilty to possession of methamphetamine in 2007. Although the parties agreed that this exhibit, which consisted of multiple documents and could not be redacted, would not go out with the jury, it was discovered after the jury had returned the verdict and were excused that the exhibit was accidentally included with the exhibits that did go out with the jury. The trial court acknowledged the mistake and admonished defense counsel that they needed

to ensure evidence excluded at their request did not make its way to the jury room, but aptly noted that there was not an appropriate remedy for the mistake at that point.

On appeal, appellants now urge that trial counsel performed deficiently by not moving for a mistrial. However, as the State points out, because the jury had already returned the verdict, the time for granting a mistrial had passed. See *State v. Sumlim*, 281 Ga. 183, 184 (1) (637 SE2d 36) (2006) ("Once the jury returns its verdict, the trial has ended and the time for granting a mistrial has passed."). Accordingly, counsel could not be considered to have performed deficiently by failing to make a futile motion.

Although not specifically enumerated as error, appellants also argue that counsel was deficient for failing to ensure that the evidence did not go out with the jury in the first place. Pretermitting whether defense counsel was deficient in this regard, appellants have failed to show a reasonable probability that the outcome of the trial would have been different but for counsel's error. First, appellants have not shown that the jury actually viewed the objectionable evidence, which was just one document among many. Further, the fact that Barbara was in possession of

methamphetamine was for all intents and purposes conceded at trial,[16] and thus any error in the admission of this evidence was greatly diminished if not nullified by the lack of defense to that count. The evidence that Barbara possessed methamphetamine was essentially overwhelming, and the error in allowing the evidence that she had previously pleaded guilty to possession of methamphetamine did not result in prejudice requiring a new trial on that charge. See *Ballard v. State*, 297 Ga. 248, 252-53 (6) (a) (773 SE2d 254) (2015); *Aikens v. State*, 297 Ga. 229, 232 (3) (773 SE2d 229) (2015) ("While it may have been objectively unreasonable for [defendant]'s trial lawyer to allow the State to introduce an exhibit that referenced allegations of these additional crimes . . . [he] has failed to establish that he suffered any prejudice as a result . . ."). Accordingly, Barbara Awtrey's convictions for possession of methamphetamine and drug related objects are affirmed.[17]

*Judgments affirmed. Barnes, P. J., and Reese, J., concur.*

---

[16] Defense counsel argued to the jury "I don't think I need to address whether or not my clients possessed either methamphetamine or marijuana. I'll leave that up to you. That's not the issue in this case, ladies and gentleman. The issue in this case is . . . the Roses product from B & B. That is the issue in this case."

[17] Ricky Awtrey's conviction for possession of marijuana is also affirmed.